(Reap. Dec. 8292)

RAYLITE TRADING CO., INC., ET AL. *v.* UNITED STATES

Entry No. 764188, etc.

(Decided February 18, 1954)

*Sharretts, Paley & Carter* (*Edward P. Sharretts* and *Howard Clare Carter* of counsel); and *Benjamin A. Levett*, associate counsel, for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*William J. Vitale*, trial attorney), for the defendant.

OLIVER, Chief Judge: These appeals for reappraisement relate to incandescent electric-light bulbs exported from Japan between October 27, 1939, and December 19, 1939. An order of dumping was issued by the Secretary of the Treasury, 64 Treas. Dec. 217, T. D. 46617, reading as follows:

After due investigation, in accordance with the provisions of section 201, Antidumping Act, 1921, I find that the industry of manufacturing incandescent electric-light bulbs and lamps in the United States is being or is likely to be injured by reason of the importation into the United States of incandescent electric-light bulbs and lamps from Japan and that such incandescent electric-light bulbs and lamps are being sold or are likely to be sold in the United States at less than their fair value.

Pursuant to the foregoing order, the appraiser made appraisement under the Antidumping Act of 1921 and found that there was no foreign market value for the articles in question, as such value is defined in the provisions of section 205 of the Antidumping Act of 1921, and that as to each of the items in question the cost of production, within the meaning thereof as set forth in section 206 of the Antidumping Act of 1921, was higher than the purchase price.

Plaintiffs claim that there existed for the merchandise in question a foreign market value under said section 205, wherein that statutory value is defined as follows:

SEC. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

In determining whether such foreign market value shall apply herein, consideration thereof is limited to the part which relates to sales or free offers for sale, within the requirements of the foregoing definition, to countries other than the United States; there being an agreement between the parties that "there was no foreign market value for domestic consumption," for merchandise, such as or similar to that in question.

The items under consideration have been identified herein as follows:

| Invoice item | Description of article | Plaintiffs' exhibit No. |
|---|---|---|
| C–6 | Cone-shaped miniature base Christmas tree bulb (R. 10) | 1 |
| C–9¼ | Intermediate base, 115-v. Christmas tree lamp (R. 11) | 2 |
| C–7½ | Candelabra base Christmas tree lamp (R. 12) | 3 |
| Spot Spiral Focusing Bulb | ---------------------------------------- | 4 |
| T–10—Tubular lamps | Showcase, 115–120 volt Edison base (R. 15) | 5 |
| T–4—Pilot lamps 120 v. Clear | Candelabra base, Pilot lamp (R. 16) | 6 |
| T–4—Pilot lamps 120 v. Frost | Same as plaintiffs' exhibit No. 6 | -------- |

Counsel for plaintiffs, in their brief, having abandoned reappraisement 138345–A as to items C–9¼ and C–7½, and reappraisement 138633–A as to item C–7½, the said appeals are hereby dismissed as to those items.

Counsel for defendant, in their brief, argue to the effect that reappraisement 138438–A is improperly before the court because "the appeal relates only to Section 501 of the Tariff Act of 1930, and not to the Appraiser's action under the Antidumping Act of 1921." The contention is without merit. "An appeal under section 501 of the Tariff Act of 1930 brings before the court every fact in relation to value." *Federated Distributors, Inc., et al.* v. *United States*, 69 Treas. Dec. 1575, Reap. Dec. 3878.

In addition to samples of the articles in question, as hereinabove enumerated, plaintiffs offered the testimony of four witnesses and documentary evidence in the form of records of sales. A review of plaintiffs' proof follows.

Abraham Abramson, secretary of the Raylite Trading Co. Inc., one of the plaintiffs herein, testified that all of his experience in connection with the exportation of incandescent electric-light bulbs from Japan has been confined to shipments received by his company in New York City, except one transaction which he explained in detail. In that particular instance, the witness ordered from Togashi of Tokyo, Japan, 600,000 bulbs which, as disclosed by the "CONFIRMATION OF ORDERS" (plaintiffs' collective illustrative exhibit A), covered "300,000 pcs. Japanese Spotlight Bulbs, 2.5 Volts" and "300,000 pcs. Korean Spotlight Bulbs, 2.5 Volts," which, the witness testified, related to articles similar to the "Spot Spiral Focusing Bulb" (plaintiffs' exhibit 4) involved herein. The original order therefor intended that the merchandise be sent to the witness' firm in New York City, but after the

order had been placed and before delivery was made, a personal friend, "Mr. Kleemann," engaged in the importing business in London, England, "who was here [in New York] buying flashlight bulbs because of the emergency in England at that time," asked the witness if "I had any flashlight bulbs coming from Japan, or if I could obtain some for him, and I said I could, and I got in touch with Togashi & Company" (R. 23). Thereafter, the Japanese exporter was directed to transfer shipment of the said purchase to O. & M. Kleemann, Ltd., of London, England. Subsequent correspondence between the witness and the London importer, and between the London importer and the Japanese exporter (plaintiffs' collective illustrative exhibit A), shows that the Japanese exporter wanted to substitute, as partial delivery on the original order, "Chinese bulbs," a substantially inferior grade of merchandise, which the London importer rejected. Whether or not ultimate delivery was made of the kind of bulbs ordered, and desired, is not disclosed.

Plaintiffs' second witness was Nobusige Minami, president of N. Minami & Co., Ltd., of Kobe and Yokohama, Japan, an exporting company that buys electric-light bulbs from Japanese manufacturers, sometimes on its own account for resale, but mostly as the agent "for New York importers," for which the witness' company receives a buying commission. The merchandise covered by reappraisements 139498–A, 138633–A, and 138435–A was purchased by the witness' company for the account of the New York importer. An examination of the invoices covered by those appeals for reappraisement shows that the items enumerated thereon were acquired from several different Japanese manufacturers, that N. Minami & Co., Ltd., of Yokohama, Japan, appears as the shipper or the seller, and that Minami & Posner Importing Co., Inc., of New York, is the purchaser.

The witness testified that the said Minami & Posner Importing Co., Inc., sometimes buys electric-light bulbs for its own account, and that, in such transactions, N. Minami & Co., Ltd., of Yokohama, the Japanese exporter, charges the New York importer the price paid to the manufacturer, plus a buying commission, ranging from 4 per centum to 15 per centum.

In another class of transactions, Minami & Posner Importing Co., Inc., of New York, orders electric-light bulbs for its customers, through the exporting company (N. Minami & Co., Ltd., of Yokohama), which buys the merchandise from the Japanese manufacturer and ships it direct to the New York corporation's customer, who pays an amount that includes the foreign manufacturer's price, plus the exporter's buying commission and the New York agent's profit, with an addition for freight and insurance. The procedure followed by the Japanese exporter in transactions involving Minami & Posner Importing Co., Inc., of New York, is also employed "for other customers in New York on the same basis."

In connection with sales to countries other than the United States, the witness stated that he had purchased in Japan electric-light bulbs, identical with the items in question, for exportation to "Canada, and also Panama." Nothing was offered to corroborate the statement that he had exported merchandise to Panama. In support of the testimony concerning shipments to Canada, sales records were produced that included items under consideration (plaintiffs' collective illustrative exhibits B–1 to B–8, inclusive). The witness stated that he obtained all of the said exhibits from the files of Minami & Posner Importing Co., Inc., of New York.

From an examination of each of the sets of papers comprising the said exhibits, it can be said that N. Minami & Co., Ltd., of Japan, shipped electric-light bulbs, such as or similar to the items in question, to firms in Canada.

Plaintiffs' third witness was Paul Lazarus, treasurer of J. Morris & Co., Inc., of Brooklyn, N. Y., with a branch office in Toronto, Canada, who is an importer of Japanese electric-light bulbs that are used in the manufacture of Christmas tree lighting outfits. The witness testified that he made all purchases of electric-light bulbs from Japan, including those used by the branch office in Canada, as well as those required by the main office in Brooklyn, N. Y. Merchandise intended for Toronto was usually shipped direct from Japan. In support of his testimony concerning shipments to Canada, the witness produced certain invoices showing that electric-light bulbs were sent by Japanese exporting companies to Toronto, Canada, "for account and risk of Messrs. J. Morris & Co., Inc., of Brooklyn, N. Y." (defendant's collective illustrative exhibits C–1 and C–2). On the matter of price, the witness stated that the basic price for all lamps was the same, but there was a price differential of "about 30 cents per thousand lot" between the merchandise sent to Canada and that received at New York. The difference in prices was explained by the witness as follows:

Well, the difference just represents a difference of price between freight to New York and Toronto. It costs us that much more to lay the lamps down at Toronto than New York, and we just add that on.

The testimony with reference to the relationship between the witness' corporation and the New York firms from whom purchases were made is rather vague and indefinite. In this connection, the witness testified as follows:

Q. Now, will you explain just how you purchased these lamps in Japan. If there is more than one way, explain what they all are.—A. We made all of our purchases from Japanese firms in New York City, who had connections in Japan, and they, in turn, placed the orders in Japan for our account.

Q. Do they act as your agent when they are doing that, or the agent of the Japanese producer?—A. Well, they make the sale to us at a specific price. Now, we pay them so much per thousand for the lamps. What their connection is, how they split it up with the source in Japan, I don't know.

Q. When they shipped it to you, was it shipped direct from Japan to you?—A. Yes, that is correct.

Q. Is it generally a c. i. f. transaction?—A. It is generally c. i. f., I believe in all cases direct from Japan. I think it always has been on a c. i. f. basis.

Defendant introduced three reports of a treasury attaché (defendant's exhibits 7, 8, and 9). Each report refers to the activities of a different Japanese manufacturer of electric-light bulbs. All state that they are makers of bulbs for export to the United States. The reports (exhibits 7 and 8) contain a positive statement that the manufacturer reviewed therein does not sell its merchandise for export to countries other than the United States. The report (exhibit 9) mentions two sales to Great Britain, but it is explained that the bulbs covered thereby are cheaper and "of somewhat inferior quality" to those shipped to the United States.

The case of *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. (Customs) 344 (p. 353), T. D. 46114, analyzed foreign market value, as defined in the Antidumping Act of 1921, as follows:

Section 205 of the antidumping act prescribes two methods of ascertaining the foreign-market value of merchandise: First, the price at time of exportation at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade for home consumption; second, the price at time of exportation of such merchandise at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade for exportation to countries other than the United States. The first method shall be followed if such price exists. Either, however, constitutes foreign-market value under this section.

It will be observed that several elements enter into a consideration of foreign-market value under said section 205. First, the merchandise or goods similar thereto must be *sold*, or *freely offered for sale* to all purchasers. Second, the goods must be so sold or offered *in the ordinary course of trade*. Third, it must be so sold or offered for *home consumption*, or, in the alternative, for exportation to countries other than the United States. [Italics quoted.]

The record before me, as hereinabove outlined, presents a condition not unlike that which existed in the case of *Sears, Roebuck & Co.* v. *United States*, 31 C. C. P. A. (Customs) 36, C. A. D. 246. There, as here, the court was confronted with oral testimony and documentary evidence, including invoices from foreign exporters, that covered merchandise substantially the same as the product there under consideration. In holding that the record evidence there adduced was insufficient to support values different from those found by the appraiser, the court stated:

As hereinbefore noted, the prices stated in appellants' invoices are in accordance with the prices covered by the contracts (Exhibits 2 to 6, inclusive), and there is nothing in the contracts or in the invoices, nor is there anything in the affidavit of Carl Nieberg (Collective Exhibit 8) or in the testimony of appellants' witness Emil H. Rennhack, to indicate that merchandise like that here involved was freely offered for sale to all purchasers in the principal markets of Germany for export to

the United States at the prices set forth in appellants' invoices. Furthermore, there is nothing in the invoices of Montgomery Ward & Co. (Collective Exhibit 1) to indicate that the merchandise covered thereby was freely offered for sale to all purchasers in the principal markets of Germany for export to the United States at the prices therein set forth.

No evidence was offered by appellants to explain the facts and circumstances in connection with the invoices of Montgomery Ward & Co. Whether the merchandise covered by those invoices was sold under contracts for unusually large quantities of wire rope, does not appear of record * * *.

The substance of the foregoing quotation has equal application to the present case. There is nothing before me explaining the facts and circumstances, or any of the details, in connection with the transactions covered by the invoices of the Japanese exporters (collective illustrative exhibits B–1 to B–8, inclusive, and C–1 and C–2, *supra*). While it can be said, on the basis of the present record, that deliveries of electric-light bulbs, such as or similar to the articles in question, were made from exporters in Japan to one company in England and several companies in Canada, there is no showing herein that the prices for the electric-light bulbs covered by such shipments were the prices at the time of exportation of the present merchandise at which such or similar merchandise was sold or freely offered for sale *to all purchasers in the principal markets of Japan, in the usual wholesale quantities and in the ordinary course of trade,* for exportation to countries other than the United States, as required by the statute, section 205, *supra*. In other words, plaintiffs have failed to establish the several elements embodied in the statutory definition of foreign market value under the Antidumping Act of 1921, as set forth in the *J. H. Cottmann & Co.* case, *supra*.

Reappraisement 138345–A, so far as it relates to items C–9¼ and C–7½, and reappraisement 138633–A, as it relates to item C–7½, are dismissed. As to the remaining items covered by these five appeals for reappraisement which were consolidated at the time of trial, I find the cost of production and the purchase price of each of the articles in question to be as found by the appraiser. Judgment will be rendered accordingly.